## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | Case Nos. CR-22-521-F |
| | ) | MJ-22-753-STE |
| KENNETH J. ROBERTS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## <u>ORDER</u>

This matter comes before the court on the appeal of the defendant-appellant, Kenneth J. Roberts ("Roberts") from a judgment of conviction entered by a Magistrate Judge, convicting Roberts of violation of 18 U.S.C. § 1382.

A. <u>Standard of Review</u>.

Roberts challenges the sufficiency of the evidence to support his conviction by the Magistrate Judge. The applicable "scope of appeal" is defined by Rule 58(g)(2)(D), Fed. R. Crim. P., which states: "The defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."

On appeal to the Court of Appeals from a judgment of conviction, where the sufficiency of the evidence is questioned, review is de novo, and the evidence is viewed in the light most favorable to the government:

> "We review the sufficiency of evidence de novo." <u>United States v. Sharp</u>, 749 F.3d 1267, 1275 (10th Cir. 2014) (quotation marks omitted). This review is "highly deferential," meaning we consider the evidence and make reasonable inferences in the light most favorable to the Government. <u>United States v. Pickel</u>, 863 F.3d 1240, 1251 (10th Cir.

1

2017).  We "will not weigh conflicting evidence or consider witness credibility."  United States v. Ramos-Arenas, 596 F.3d 783, 786 (10th Cir. 2010) (internal quotation marks omitted).  And we will reverse the conviction only "if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Pickel, 863 F.3d at 1251 (internal quotation marks omitted).

United States v. Burtrum, 21 F.4th 680, 685–86 (10th Cir. 2021).

B.    Contentions at trial and on appeal.

The defendant, having engaged in a course of conduct on Fort Sill which the Magistrate Judge characterized, in part, as "high-level creepy," Tr. 240,[1] was charged with assault, disturbing the peace and trespassing.  He was acquitted on the first two charges.  He was convicted of trespassing in violation of 18 U.S.C. § 1382, which states as follows:

> Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
>
> Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—
>
> Shall be fined under this title or imprisoned not more than six months, or both.

The heart of the government's case in support of the trespassing charge was that Roberts had been banned from entering the PX on Fort Sill by Captain Shelby Martinez of the Fort Sill Police Department.  Martinez is "one of the supervisory police officers or watch commanders for Fort Sill."  Tr. 150.  The government

---

[1] "Tr." references are to the transcript of the trial, doc. no. 9.

charged that Robers had been banned from the PX on September 9, 2022 and violated § 1382 on October 13, 2022 by entering the PX.

The centerpiece of Roberts' appeal is that "there was no evidence to suggest that Martinez had the actual authority to order Roberts not to enter the PX, nor was there sufficient evidence to suggest that she actually ordered him not to reenter." Doc. no. 13, at 13-14.

C.    <u>Actual authority and banishment from the PX</u>.

The evidence bearing on the issue of Martinez's lack of "actual authority to order Roberts not to enter the PX" should be considered in light of the fact that the authority of an agent, such as Martinez, can be proven from the testimony of the agent:

> The existence of the relationship of principal and agent as well as the extent of authority which the agent my exercise *can of course be proven by the sworn testimony of an agent*, as distinguished from his declarations made out of court. <u>Citizens' Bank of Gans et al. v. Mabray</u>, 90 Okl. 63, 215 P. 1067; <u>Munn v. Mid-Continent Motor Securities Co.</u>, 126 Okl. 241, 259 P. 249; but the declarations or acts of the purported agent made out of court (with certain exceptions not here involved, as for instance when such declarations constitute a part of the res gestae) are without probative force to establish the existence or extent of the agency. <u>Garland v. Frazier</u>, 177 Okl. 493, 61 P.2d 188; <u>Garrett v. Reinhart</u>, 169 Okl. 249, 36 P.2d 884; <u>Pierce Oil Corporation v. Myers</u>, 117 Okl. 161, 245 P. 863; <u>Skelly Oil Co. v. Pruitt & McCrory</u>, 94 Okl. 232, 221 P. 709; <u>Green Construction Co. v. Empire Dist. Electric Co.</u>, 92 Okl. 127, 218 P. 1074.

<u>Georgia State Sav. Ass'n of Savannah, Ga. v. Elias</u>, 135 P.2d 36, 40 (Okla. 1943) (emphasis added).

Roberts managed to wear out his welcome at the PX, as witness the fact that his presence at the PX on September 9, 2022 resulted in an encounter between Roberts and Martinez.  In the trial before the Magistrate Judge, Martinez described that encounter in considerable detail.  Woven into her description of the encounter

itself was some examination and cross-examination as to her authority to ban Roberts from the PX. As relevant here, the most noteworthy segments of Martinez's testimony on those issues – whether she banned Roberts from the PX and whether she had authority to do so – are as follows:

> Q   Okay.   On this date and time, did you ban Mr. Roberts from going into the PX?
>
> A   I did verbally, yes.
>
> Q   Okay. So tell me about that conversation with him.
>
> A   The conversation I had was regarding him and the statements that were being told to us about him and the individuals in the PX. Due to that and the prior incident at the commissary and what the assistant manager had told me, that they don't want him in the PX because he was harassing their customers, so I verbally told Mr. Roberts that he's no longer allowed inside the PX or the commissary, which he was going to get his letter from.
>
> Q   Okay. Now, who all has the authority to ban people? Like, who can do that?
>
> A   Well, law enforcement has the authority to ban people from areas due to things that they're doing, yes, sir.
>
> * * *
>
> Q   Well, I guess, could you just explain in more detail your authority to –
>
> A   Okay. So, acting as a supervisory police officer, generally the police officers will ask me for my decision on making the call on somebody not being allowed into a premises. For Mr. Roberts' reason, it was due to a criminal act of harassing people and the customers inside of the building.
>
> Q   Okay. And so, just to be perfectly clear, you have the authority to tell him that he is banned from the PX?

A    Yes.

* * *

Q    When you spoke to Mr. Roberts when you did this – when you banned him, did you speak to him directly?

A    I did.

Q    Was it clear to him that you were a law enforcement officer?

A    Yes, it was.

Q    Did he hear you and indicate that he understood?

A    Yes, he did.

Q    So he was aware that you had told him he was banned –

MR. WATSON:  Objection.

Q    (By Mr. Brannon) – from the PX?

A    He did.

MR. WATSON:  Speculation, your Honor.

THE COURT:  Okay.  I'll let you cross-examine on it. Go ahead and ask that same question.

Q    (By Mr. Brannon) He was aware that – did he confirm that he understood?

A    He did confirm that he understood, yes, sir.

* * *

Q    How did he confirm – how are you sure that he confirmed that he knew he wasn't supposed to go back to the PX?

A   He told me verbally that he understood. He said he didn't – he didn't want to go back in there anyway –

Q   Okay.

A   – was his exact words.

\* \* \*

Q   Okay. So you have the authority to ban people from buildings?

A   Yes.

Tr. 158-161; 163-64; 167.

Having heard that evidence, as well as Roberts' flat denial that he had been banned from the PX, Tr. 204, the Magistrate Judge found as follows, as relevant here:

> Captain Martinez, certainly one of the more credible witnesses from the government, Witness No. 10, she's a supervisor. And she testified clearly that she banned you, Mr. Roberts, from entering the PX. That's on September 9th. And that she had the authority to do so.
>
> \* \* \*
>
> So let's look at the statute. So on October 13th, I find that you entered the Fort Sill Military Reservation for a purpose prohibited by law. You had been banned from the PX. Your intent – we know this because you went there – was to go to the PX, and you had been banned from the PX. That was on October 13th.
>
> \* \* \*
>
> But what was the purpose prohibited by law? Well, it was you actually entered the Fort Sill Military Reservation on October 13th to go to the PX, and the crime there would have been trespassing. So there's your purpose prohibited by law.
>
> \* \* \*

6

And I find that he was banned from the PX and by entering a Fort Sill Military Reservation after he was banned to go to the PX yet again, that's a purpose prohibited by law or lawful regulation.   And, for good measure, we'll throw in the Trusted Traveler regulation as well.

Tr. 241-242; 244.

There is no basis in this record upon which the court could overturn the findings and judgment of the Magistrate Judge on the question of the guilt or innocence of Kenneth Roberts.  The testimony of Captain Martinez was clear and unequivocal.  It was consistent with the testimony of the other government witnesses.  The record amply supports the Magistrate Judge's determination that every element of the offense charged under 18 U.S.C. § 1382 was established beyond a reasonable doubt.  The judgment entered by the Magistrate Judge on November 11, 2022 in Case No. MJ-22-753-STE in this court is in all respects **AFFIRMED**.

DATED this 21st day of March, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

22-0521p006 .docx

7